**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JODY LYNN COOPSHAW,
et al.,

        CASE NO. 06-CV-13246

        Plaintiffs,

        PAUL D. BORMAN

-vs-        UNITED STATES DISTRICT JUDGE

DETECTIVE SERGEANT
JOHN FIGURSKI, et al.,

        Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants Irving C. Shaw, Jr. and Lenawee County's May 30, 2007

Motion for Summary Judgment. (Doc. No. 17). Plaintiffs Jody Lynn Coopshaw and Robert Larry

Thornton (as Next Friend of Alexis Paige Arecena, a minor) ("Plaintiffs") filed their Response

on July 2, 2007. The Court held a motion hearing on January 16, 2008. Having considered the

entire record, and for the reasons that follow, the Court GRANTS IN PART and DENIES IN

PART Defendants' motion.

**I.      BACKGROUND**

The case arises from Plaintiff's allegations that Defendants executed an illegal search

warrant at Plaintiffs' residence in connection with the investigation of the death of Jesalynn

Simons.

On December 11, 2003, at approximately 5:00 p.m., Lenawee County Sheriff's Office

deputies attempted to stop Simons for a traffic violation in the City of Adrian, Michigan.

(Compl. ¶ 14). Simons failed to stop, and a pursuit ensued. (Compl. ¶ 15). Lenawee County deputies and Michigan State Police troopers participated in the subsequent pursuit. (*Id.*). During the chase, police vehicles forced Simons from the road. (Compl. ¶ 16). Michigan State Police Trooper David Rivard then emerged from his squad car. In an apparent attempt to evade the police, Simons backed up her car towards the street. During this attempt, Rivard, who was nearly hit by Simons' vehicle, drew his pistol and shot Simons through her car's passenger window.

At approximately 7:15 a.m. on December 12, 2003, Simons died as a result of the gunshot wound at a hospital in Toledo, Ohio. (Compl. ¶¶ 16-18).

Detective Sergeant John Figurski of the Michigan State Police post in Adrian was assigned to investigate the death of Simons. (Pl. Br. Exs. 2-3, Figurski Dep. 20-21). During the course of the investigation, two judicially-approved search warrants were obtained. The first warrant, not at issue in the instant case, involved a search of Simons' vehicle immediately following the incident.

The second warrant, obtained on December 16, 2003, authorized a search of the residence of Simons and her mother. Pursuant to local district court policy, Lenawee County Prosecuting Attorney Irving C. Shaw, Jr. reviewed and approved the search warrant application in question. District Judge James E. Sheridan issued the warrant based on the affidavit without holding a hearing.[1]

---

[1]    The December 16, 2006 search warrant affidavit contained the following information:

1.    Affiant is a Detective Sergeant with the Michigan State Police currently assigned to the Adrian post and has thirteen years of law enforcement experience.

2.    Affiant is investigating a shooting incident involving a 1986, Buick, Century, four door, bearing Michigan registration [XXXXXX], tan in

color, registered to Robert and Lillian Thornton, [XXX XXXXX] Dr., Adrian, Michigan.

3.      The preliminary investigation indicated that at about 5:00 p.m. this dated, 12/11/03, a Lenawee County Deputy Sheriff, on routine patrol, sighted the vehicle above described. Said vehicle was being operated by it[s] only occupant, now identified as Jesalynn Rene Simons, dob: 9/5/1985. The vehicle was then located on northbound M-52 near Cutis Road in Adrian Township, Lenawee County, Michigan.

4.      Affiant was informed by said officer that the vehicle came to his attention because one of the vehicle headlamps was not functioning, the vehicle was straddling the two northbound lanes, then weaved within the east northbound lane, and that he attempted to stop said vehicle by activating his marked patrol car emergency lights and siren.

5.      He further reports that the driver and sole occupant of said vehicle responded by turning south on Howell Highway and accelerating in an effort to flee, at which time the deputy called for assistance.

6.      Officer reports to affiant that the pursuit continued over a distance of 1 mile or more to a point where said vehicle was fleeing westbound on US-223 near Wolf Creek Highway, with the original sheriff patrol car and three other marked patrol vehicles in pursuit, and that the operator of the vehicle was still operating said vehicle in a reckless and dangerous manner, and at that point all four vehicles were using their emergency lights and sirens in an effort to stop the fleeing vehicle.

7.      Affiant has seen a video recording taken by a camera on-board one of the pursuing patrol vehicle. The video indicates to affiant that the officers were then attempting to stop said vehicle by maneuvering their vehicles so as to partially box-in the fleeing vehicle and east [sic] it safely off the highway. The video shows considerable other traffic and indicates, generally, a very dangerous situation.

8.      The video further indicates to affiant that Simons was still fleeing and eluding and swerved her vehicle into contact [with] one of the police cars, and that this action on her part resulted in a situation in which the four police cars finally came to rest surrounding her vehicle.

9.      The video further indicates to affiant that Simons then began using her vehicle in a forward and reverse motions [sic] in an apparent effort to strike police vehicles and/or police officers, some of whom, by this point, were out of their vehicles and on foot. Further, the video indicates to affiant that State Police Trooper Rivard's position was on foot within a

3

few feet of the right front door of the said vehicle, and he was nearly struck or run down by the operation of said vehicle by Jesalynn Simons, and that as Trooper Rivard moved to avoid being hit, he fired service pistol at the right front door of said vehicle.

10.    Affiant has been informed that the driver, Simons, was struck in the legs by said shot. The video indicates that the result was that there was not further effort to flee or assault officers.

11.    Jesalynn Simons was treated at the Medical College of Ohio, and apparently died as a result of wounds, her vehicle is under impoundment.

12.    Rosalynda Martinez-Faz informed your affiant that she was Jesalynn Simons['] legal guardian for approximately one year prior to Jesalynn's 17th birthday. Jesalynn Simons lievd with Martinez-Faz several times during the time.

13.    Affiant was informed by Martinez-Faz that Jesalynn Simons had a "really bad Temper." Martinez-Faz stated she taught Jesalynn Simons to write her frustration down in a journal in an effort to control her anger. Jesalynn Simons told Martinez-Faz she wrote in her journal every day. Martinez-Faz witnessed Simons making the said entries in her journal on several occasions.

14.    Affiant was informed by Martinez-Faz that she spoke to Jesalynn Simons approximately three weeks prior to 12-11-03. Simons advised Martinez-Faz she was depressed, suicidal, had recently quit her job, and had no money. Martinez-Faz advise[d] your affiant that Simons had also talked of suicide on past occasions.

15.    Affiant was advised by Martinez-Faz that she spoke to Jesalynn Simons on 12-8-03 via telephone. Simons advised Martinez-Faz she was depressed and "frazzled" to the point were [sic] she could not think straight, and asked Martinez-Faz for approximately $500.

16.    Affiant was informed by Martinez-Faz that Jesalynn Simons contacted her from Jody Coopshaw's residence via telephone on 12-10-03. During that conversation Simons told Martinez-Faz she had mad entries into her journal that day. Simons also agreed to meet with Martinez-Faz on 12-16-03 at the Adrian Fazolis to discuss her current frustrations. Simons told Martinez-Faz she would bring her journal to the meeting.

17.    Martinez-Faz informed your Affiant that Jesalynn Simons told her she kept her current journal between the mattresses of her bed and kept the completed editions of her journal in a white clothes hamper. Simons also

retained numerous letters, notes, etc. she considered significant in the above described box.

18. Affiant was informed by Larry Thornton, Jesalynn Simons' grandfather, that Jesalynn had moved into her mother's, Jody Coopshaw's, apartment several weeks prior to 12-11-03. Thornton advised Jody Coopshaw lives in an apartment complex located near the scene of the shooting incident, believed to be the [. . . .] Apartment Complex.

19. Affiant was informed by the owner of [said] Apartment complex, Katherine Tipton, that Jody Coopshaw was one of her tenants and was currently living at [a certain apartment address] in Adrian, Michigan.

20. Affiant seeks warrant to search said apartment for the reasons set forth above in an effort to determine with the most positive certainty what factors lead to the above incident and what crimes may have been committed and the reasons therefor.

21. Further Affiant sayeth not.

(Def. Br. Ex. A, Search Warrant Affidavit).

The search warranted indicated that Figurski was authorized to "seize, secure, tabulate and make return according to law the following property and things:"

Any/all notebooks, journals, diaries, letters, notes, computer based information appearing to belong to Jesalynn Simons, an approximate six inch by six inch black box, and any other evidence which may explain the manner in which said vehicle was operated, and/or why the vehicle operator evaded a traffic stop, attempted to flee and elude the police effort to stop the vehicle safely and assaulted police officers with said vehicle.

(*Id*.).

On December 16, 2003, from approximately 5:30 p.m. to 6:15 p.m., while the residents of the house were at Simons' funeral, Figurski, troopers from the Michigan State Police Department, and other local police officers executed the search warrant at Plaintiffs' residence in Adrian. (Compl. ¶ 27). The "return and tabulation" from the search warrant execution listed: (1) a Hewlett-Packard computer; and (2) a "red notebook 10 1/2" x 8" college rule, 70 sheets, marked 'Jesa's only'." (Def. Br. Ex. A, Return and Tabulation).

The Lenawee County Prosecutor's Office did not ultimately file any criminal charges as a result of the investigation.

Plaintiffs contend that the second search warrant was not supported by probable cause, since Simons, then-deceased, could not be charged with a crime, and there was no other evidence suggesting any past or ongoing criminal activity at their residence.

Figurski testified that his assignment only involved the criminal investigation, and not civil. (Pl. Br. Exs 2-3, Figurski Dep. 15).[2] He admitted that although Simons could not be charged with a crime after her death, the search warrant was relevant to investigating the "entire incident" or the "totality of the incident." (*Id*. at 19, 71, 75). He added that a partial reason for the investigation was to determine whether Simons was "suicidal" or "angry or upset." (*Id*. at 287-88). Although Rivard was a target of the investigation, he was not interviewed – Figurski stated that he was prevented by his rank from interviewing him. (*Id*. at 43). Figurski also admitted that at the time of the obtaining of the second warrant there was no probable cause to believe that there was any evidence at Plaintiffs' residence relevant to the investigation of Rivard. (*Id*. at 66-

---

[2]      The depositions submitted by the parties in the instant federal case were conducted as part of a previous state court civil action in Lenawee County Circuit Court, involving the police officers involved in the Simons' death.

67, 76-77). Thus, the only purpose of the warrant was to gather evidence for an alleged criminal investigation of Simons, who was then deceased.

Figurski testified that he had contact with Prosecutor Shaw throughout his investigation of Simons and Rivard and had "discussions with him about what to do and what not to do" and what "areas to look at." (*Id*. at 21). After Simons was transported to the hospital, Figurski contacted Shaw to see if there was a need for the police to detain her. (*Id*. at 86-87). After Shaw and Figurski initially discussed the idea of obtaining a search warrant of Simons' car, they both went to the Michigan State Police post in Adrian to watch the squad car videotape of the shooting. (*Id*. at 97-98). After a "number of conversations," Shaw and Figurski wrote, together, the first search warrant, for Simons car. (*Id*. at 90). Figurski described the writing of the first search warrant affidavit as a "give and take" where Figurski "wrote" and Shaw "approved." (*Id*. at 100). Figurski stated that, save for "no-brainers," his search warrant affidavits are a "cooperative effort between [him] and the prosecutor." (*Id*. at 115).

Figurski also testified that Shaw helped him write the second warrant. (*Id*. at 177, 181, 255). He recounted that Shaw helped him with the proper "legalese . . . . to make sure that the search [ ] warrant [was] done properly." (*Id*. at 268).

At the same time, Figurski stated that Shaw advised him that he needed to follow up on, and solidify, additional details before writing the search warrant affidavit for Plaintiffs' residence:

> Q:    You and Prosecutor Shaw did discuss whether or not this is particularized enough or is this just a general search, you two did discuss that subject matter with respect to this final clause in both search warrants; and I correct?
> A:    Sort of, we discussed – absolutely discussed the place to be seized, the items – the items to be secured and the affidavit as it applies to those –

those particular items, but I can't remember the exact conversation of what was said or not, but yes, we did discuss the items to be seized.

. . . .

Q:  Okay. All right. Now, I want to return to your report, page 22. You reinterviewed Ms. Martinez-Faz, why did you do that?

A:  At the time that I received that information from Coolidge and – and Heindel I believe I called Irv Shaw and say hey, listen, this is the – the information that we have and basically he didn't think we had enough to do a search warrant at that time and wanted some of the particulars, not just from Martinez-Faz, but from – other particulars specified before I could write the affidavit to get the search warrant.

Q:  What was lacking, why didn't you have, what Heindel and Coolidge failed to get that Shaw wanted?

A:  There was a couple of things, I'm trying to remember. I think that we wanted to, when I talked to her, to freshen up the – the – or see when the last time was that she had actually seen these journals or heard about entries being made. There was also – Irv – I believe Irv directed me to try to solidify the – that she actually lived there, which I ended up calling the grandfather and then also I did it through calling the – or talking with the – the manager of the – of the apartment building.

Q:  So Mr. Shaw wanted more recent entries in a journal and proof that – that Jesalynn Simons actually lived with her mother?

A:  He wanted further information for the affidavit to clarify those issues that I just said.

. . . .

Q:  The 15th?

A:  – the day – it would have been the – the day – the afternoon of the – or the morning of that day. It may have even been the day before, after I had a – basically a debriefing with Coolidge and Heindel about the information and trying to – to run that way with the information based on what they had told me and then Irv said well, we need to – we need more before – that there's not enough there basically to issue the warrant, you need to do some more things there to – for the affidavit to get it to go – to make the warrant –

Q:  Right. And that –

A:  – valid.

Q:  – and that happened on the 15th –

A:  I don't –

Q:  – the day that Coolidge and Heindel talked to Martinez-Faz?

A:  They – I don't remember – I had multiple conversations with Irv. I don't remember, they might have been the 15th and the 16th, but they were prior to the execution of this warrant.

. . . .

Q:  And you had, you said, several conversations with Prosecutor Shaw regarding this search warrant as well; is that right?

A:      Yes.

Q:      He was guiding you in how to conduct your investigation in such a way that you could get your search warrant?

A:      He was guiding me not in the investigation, but on the – of what he felt would be the probable cause in the affidavit for the – for the search warrant.

(*Id*. at 270:10-22; 284:20-25, 285:1-23; 289:4-13).

Shaw agreed that Simons could not be prosecuted for any crime after she died. (Pl. Br. Ex. 4, Shaw Dep. 77). When asked what probable cause existed for the second search warrant, Shaw responded:

A:      The tax payers of Lenawee County were entitled to know what had occurred, how it has occurred, why it had occurred, who was involved. I was reviewing this material brought to me for the purpose that is declared in the letter, to evaluate any and all criminal activity. I didn't make any distinctions as to criminal activity on the part of what person, just to evaluate it on the – on the basis of whether there was any criminal activity involved by anyone, and if so, what it was, and that was it, and I did that.

. . . .

Q:      Was there ever any suggestion of criminal activity on the part of anybody else?

A:      No in particular as I've told you. There's a class of cases which I receive from time to time saying please evaluate for possible criminal activity, which is what I do.

(*Id*. at 77:14-4, 78:9-14).

As to Shaw's involvement with the investigation leading up to the second search warrant, Shaw testified that Figurski "periodically [ ] let [him] know how the investigation was progressing in [ ] respect to time so that I might have some idea when I would be asked to evaluate this." (*Id*. at 17:11-14). Shaw admitted that he had several conversations with Figurski about the investigation leading up to the search warrant authorizations. (*Id*. at 19). Shaw admitted that Figurski asked for his advice on whether or not to detain the Simons, while she was still hospitalized. (*Id*. at 21-22). Shaw stated that on the first search warrant, he advised Figurski

that the warrant affidavit "looked fine" and that the warrant was not "legally necessary" since the officers could have accessed the car under the "inventory search exception." (*Id*. at 22).

Shaw testified that in his view, as part of his duty to review and approve the search warrant request, he thought that the affidavit contained sufficient probable cause to support the request:

> Q: Are you saying that you had no obligation to review the search warrant to see whether or not it was facially invalid because you could rely upon the court to do that for you?
>
> A: No, not at all, and you know better than that. When I looked at it, I thought that it was fair. I thought it was appropriate. I thought it was be issued by the court. I approved it. I would do it again.
>
> . . . .
>
> A: It was also my job to authorize the search warrant. I did because I didn't think that he did go too far, that he did ask for too much.
>
> Q: If he went too far, is it up to you to tell him too?
>
> A: I would have if I had thought that.
>
> Q: And what you were doing here in authorizing this search warrant was participating or assisting the Michigan State Police in the conduct of their investigation?
>
> A: No. We do not assist investigations, the law makes a clear distinction where we simply give legal advice to police officers relative to search warrants and we do that routinely.
>
> Q: Okay. So you gave legal advice to Detective Sergeant Figurski in connection with his conduct of his investigation.
>
> A: Exactly. Yes. In the sense that he would say – in effect he was saying to me is – is this a lawful and proper search warrant request. I read it over, I thought it was, and I authorized the issuance if the court wanted to do that.
>
> Q: And at the time there were no pending criminal charges?
>
> A: That's right.

(*Id*. at 122:16-23; 141:20-25, 1-18). While Shaw admitted that there was no probable cause to target Simons for prosecution, "i[t was] possible that in the search for evidence of her criminal activity, evidence of criminal activity of other people could also have been found." (*Id*. at 20-23).

Shaw indicated that none of the evidence brought to him by Figurski supported any criminal charges against Rivard. Shaw "did not evaluate this for any aspect of civil liability." (*Id*.

at 35). In his view, "Officer Rivard fired a defensive shot." (*Id.* at 161:8-9). After receiving the criminal investigation file in June 2004, Shaw did not recommend filing any criminal charges. (Def. Br. Ex. B, Shaw Aff. ¶ 16).

On July 18, 2006, Plaintiffs filed a Complaint in this Court, asserting the following causes of action:

| | |
|---|---|
| Count I: | Violation of Plaintiffs' First, Fourth, and Fourteenth Amendment Rights |
| Count II: | Conspiracy to Violate Plaintiffs' Civil Rights by Defendants Cognizable under 42 U.S.C. § 1983 |
| Count III: | Supervisory Liability of Defendant Steven Farrell Cognizable under 42 U.S.C. § 1983 |
| Count IV: | Defendant Shaw's Violation of Plaintiffs' Fourth and First Amendment Rights |
| Count V: | County Liability for Individual Defendants' Violation of Plaintiffs' Constitutional Rights |

Plaintiffs state that Defendants' "true motive" was to "intimidate and/or harass Plaintiffs into not filing a civil action related to the death of [ ] Simons, attempt to taint the public image of the Plaintiffs, improve the public image of Defendants and other law enforcement officials and entities, and to search for potentially exculpatory evidence in anticipation of civil litigation." (Compl. ¶ 21). Plaintiffs allege that Defendant First Lieutenant Steven Farrell and Figurski "conspired to search for evidence outside the scope of the facially invalid warrant without probable cause by unreasonably agreeing to search for a possible narcotics connection in Plaintiffs' home, despite there being no probable cause or reasonable basis to believe there were any illegal drugs connection with or in possession of Ms. Simons (deceased) or Plaintiffs." (Compl. ¶ 25).

Plaintiff alleges that Shaw, "acting in his investigative capacity and not in his prosecutorial capacity, knowingly, intentionally, and/or recklessly violated Plaintiff's Fourth

11

Amendment rights . . . . by assisting Defendant Figurski in drafting of the search warrant and search warrant affidavit and then approving it." (Compl. ¶ 51).

On February 1, 2007, the parties agreed to dismiss with prejudice Defendants Figurski and Farrell.

On May 30, 2007, remaining Defendants Shaw and Lenawee County filed a motion for summary judgment, arguing that: (1) Shaw was entitled to absolute immunity for his actions related to this incident as a county prosecutor; and (2) Plaintiffs failed to produce any evidence supporting their claims against Lenawee County.

## II.   ANALYSIS

### A.   Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has recently summarized the relevant legal standard for summary judgment motions:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B.   Section 1983 Illegal Search Claim against Defendant Shaw

1.   Absolute Immunity

Shaw contends that he is entitled to absolute immunity for his actions in connection with the search warrant, arguing: (1) that Plaintiffs have failed to allege Shaw acted an "investigatory capacity" or provided "legal advice" to Figurski; and (2) that Shaw's review and approval of the search warrant application in connection with a judicial proceeding are entitled to absolute immunity.

Shaw states that Lenawee County Prosecutor's Office policy is that the office does not get "involved in any way, in any law enforcement investigation by any agency, nor engage in or assist any investigative work of a non-criminal nature for any administrative agency[.]" (Shaw Aff. ¶ 2; Def. Br. Ex. D, Riley Aff. ¶ 2). Shaw further swears that his office did not play any part in the investigation of the Simons incident, nor provided any legal advice to the officers investigating the incident. (Shaw Aff. ¶¶ 4-5). Shaw admits that he was asked to review the search warrant affidavit and reviewed the proposed search warrant affidavit before submission to the district court judge. (*Id*. ¶¶ 8-11). Shaw attests that no one in the Lenawee County Prosecutor's Office appeared before Judge Sheridan, nor participated in the search warrant execution. (*Id*. ¶¶ 11-12). Upon receiving the investigatory "package" of the incident in June 2004, Shaw concluded that there was "no evidence depicted in the report of prosecutable criminal activity, although Jesalynn Simons could have been prosecuted for various civil infractions, misdemeanors and felonies in respect to her conduct during the police pursuit." (*Id*. ¶¶ 15-16).

Chief Judge James E. Sheridan of 2A District Court in Adrian, Michigan additionally states in an affidavit that Lenawee County courts "require that law enforcement officers seeking a search warrant first have the body of the warrant reviewed by the prosecuting attorney of the

governmental unit, which would be enforcing any criminal action, which might arise as a result of the search." (Def. Br. Ex. C, Sheridan Aff. ¶ 3). On the reason for this policy, Judge Sheridan opined:

> It is, and always has been, my understanding that the historic reason for the review by the prosecutor is to increase the chances that the paperwork will be correct the first time the judge is asked to approve it. I am informed and do believe that this policy arose during the time when most police officers did not have formal training in criminal justice procedures, and very few had college degrees.

(*Id.* ¶ 14).

The Court finds that, viewing the evidence in the light most favorable to Plaintiffs, Shaw is not entitled to absolute immunity for his alleged actions in participating in the investigation of Simons and Rivard, nor for providing legal advice to Figurski. However, the Court holds Shaw is entitled to absolute immunity for fulfilling his judicially-delegated duty to review and to approve the search warrant.

The Sixth Circuit has provided an overview of the law governing absolute immunity as it applies to prosecutors:

> Since the [Supreme] Court's decision in *Imbler,* courts have taken a functional approach to absolute immunity. Using this approach, courts have concluded that a prosecutor is protected "in connection with his duties in functioning as a prosecutor." Accordingly, prosecutors are absolutely immune from many malicious prosecution claims. Likewise, absolute immunity is appropriate for claims based on the prosecutor's appearance at a probable cause hearing and before a grand jury. Absolute immunity applies to "acts . . . . includ[ing] the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." Preparation of witnesses for trial is protected by absolute immunity. As the Court concluded in *Imbler,* even the knowing presentation of false testimony at trial is protected by absolute immunity.

> However, "prosecutors are not entitled to absolute immunity for 'investigative' or 'administrative' acts." Thus, prosecutors are not entitled to absolute immunity for the act of giving legal advice to police. Prosecutors have only qualified immunity

for authorizing warrantless wiretaps in the interest of national security. A prosecutor is not entitled to absolute immunity for statements made in an affidavit supporting application for arrest warrant. Similarly, out-of-court statements made by a prosecutor at a press conference are administrative acts not entitled to absolute immunity.

As this Court has explained, "The analytical key to prosecutorial immunity, therefore, is *advocacy* – whether the actions in question are those of an advocate." Thus, the "critical inquiry is how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process."

*Spurlock v. Thompson*, 330 F.3d 791, 797-98 (6th Cir. 2003) (internal citations omitted) (emphases in original). "The burden is on the official seeking protection to prove that absolute immunity is justified." *Id.* at 796.

In *Burns v. Reed*, 500 U.S. 478 (1991), the United States Supreme Court held that although the defendant state prosecutor was absolutely immune from civil liability for his conduct in appearing at a probable cause hearing to support an application for a search warrant, the prosecutor did not enjoy absolute immunity for "giving legal advice to police." *Id*. at 492, 496. In *Burns*, police officers sought the advice of the prosecutor pertaining to: (1) whether using hypnosis on the suspect was an acceptable investigative technique; and (2) whether the hypnosis-induced confession provided probable cause to arrest the suspect. *Id*. at 482. Based upon the prosecutor's advice and the suspect's confession, the police officers arrested the suspect. The next day, the police officers and the prosecutor appeared before a judge to obtain a search warrant for the suspect's house and automobile. Before trial, the trial judge suppressed the confession on the defendant's motion; and the prosecutor subsequently dismissed all charges. *Id*. at 483. The plaintiff argued that there were two bases for liability for the prosecutor: (1) his

participation at the probable cause hearing for the search warrant; and (2) the legal advice given to the police officers.

The Supreme Court held initially that the prosecutor's appearance at the probable cause hearing for the search warrant was shielded by absolute immunity. *Id*. at 491-92. However, the Court recognized that the prosecutor's role in providing legal advice for police officers to aid in their investigation is analyzed under qualified, rather than absolute, immunity:

> In the first place, a suspect or defendant is not likely to be as aware of a prosecutor's role in giving advice as a prosecutor's role in initiating and conducting a prosecution. But even if a prosecutor's role in giving advice to the police does carry with it some risk of burdensome litigation, the concern with litigation in our immunity cases is not merely a generalized concern with interference with an official's duties, but rather is a concern with interference with the conduct closely related to the judicial process. Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct.
> . . . .
> Although the absence of absolute immunity for the act of giving legal advice may cause prosecutors to consider their advice more carefully, "'[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate.'" Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not.

*Id*. at 494-95 (internal citations and footnote omitted) (emphases in original).

Two years later, in holding that a prosecutor's statements to the media are not protected by absolute immunity, the Supreme Court further refined its analysis in *Burns*:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a

detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

. . . .

A prosecutor neither is, nor should consider himself to be, an advocate *before he has probable cause to have anyone arrested*.

. . . .

A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

*Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 274, 276 (1993) (internal citations and footnotes omitted) (emphasis added).[3]

---

[3]    The Sixth Circuit has recognized in several situations that the prosecutor's actions in giving legal advice to police officers were not protected by absolute immunity.

In *Manetta v. Macomb County Enforcement Team*, 141 F.3d 270 (6th Cir. 1998), the court held that the defendant prosecutor was not entitled to absolute immunity for his participation in the investigation of a possible extortion scheme and his order to have the suspects held on the charges. In that case, a state police detective began investigating a couple who possibly were involved in a scheme to extort money from the woman's ex-employer. *Id*. at 272. The detective provided the potential victim recording equipment to tape any telephone calls originating from the suspects. *Id*. The detective then approached a prosecutor and provided the tapes and their summaries. Since the couple had retained counsel for a possible sexual harassment claim, the prosecutor told the detective to tell the potential victim not to initiate any further contact with the suspects. *Id*. at 273. When the couple and victim agreed to settle the matter for $100,000 before the sexual harassment lawsuit was filed, the prosecutor assisted the detective in preparing a release and arranging to get marked currency for the planned controlled exchange. *Id*. When the couple arrived to collect the money and to sign the release, they were arrested. The prosecutor then instructed the detective to hold the couple on extortion charges. *Id*. at 274.

The court found that the prosecutor was not "absolutely immune for either his role in the preliminary investigation of [the couple] or his decision to order the couple held on the extortion charges after the controlled exchange at the restaurant." *Id*.

In *Prince v. Hicks*, 198 F.3d 607 (6th Cir. 1999), the Sixth Circuit similarly found that the prosecutor's actions alleged in the complaint in connection with the preliminary investigation as well as her legal advice to police were not shielded by absolute immunity. In that case, a family initially agreed to allow the plaintiff physical custody of a child while the mother went to drug

rehabilitation. *Id*. at 610. The plaintiff refused to return the child to the family and sought an emergency protective order from the state court. *Id*. The family contacted the prosecutor, who then prepared with a detective an affidavit of arrest for the plaintiff. The criminal court judge approved the issuance of an arrest warrant, but then later ordered that the plaintiff be released on her own recognizance as soon as she turned herself in. *Id*. The prosecutor then went to a chancellor – and without informing the chancellor of the judge's latter decision – requested that the plaintiff be held without bond. After the plaintiff turned herself in, the chancellor ordered the release of the plaintiff. *Id*. The plaintiff alleged that the prosecutor and police continued to threaten her, offered her a plea bargain if she waived any civil liability related to her arrest, and threatened media coverage of the arrest. The case against the plaintiff was eventually dismissed. *Id*.

The court initially recognized that "[t]he line between conduct that is part of a preliminary investigation and conduct that is intimately associated with the judicial phase of a criminal proceeding is difficult to draw in some cases." *Id*. at 612. The court found that the following allegations in the plaintiff's complaint survived the absolute immunity defense: (1) allegations that the prosecutor either performed a grossly inadequate investigation, or no investigation at all; (2) the prosecutor's legal advice that the police officer had probable cause to arrest the plaintiff. *Id*. at 612-15.

On the issue of providing legal advice, the court made the following distinction between a prosecutor participating in an investigation before the establishment of probable cause to arrest a suspect, and participation once probable cause to arrest has been established:

> The complaint, read in the light most favorable to Prince, alleges that Hicks gave Hazelhurst advice as to probable cause and Hazelhurst acted on it. Although the next few paragraphs of the complaint characterize Hicks and Hazelhurst as together initiating criminal proceedings against Prince, the complaint can be read to allege that Hicks gave Hazelhurst legal advice prior to the existence of probable cause and prior to Hicks's determination that she would initiate criminal proceedings against Prince. Hazelhurst then "executed the warrant in reliance, in whole or in part, on that advice." At the time this advice was given, Hicks would not have been acting as an advocate for the state.

*Id*. at 614-15 (internal citations omitted).

Finally, the Sixth Circuit's most recent opinion on absolute immunity, *Harris v. Bornhorst*, – F.3d –, 2008 WL 114853 (6th Cir. 2008), held that a prosecutor who ordered a police officer to arrest a suspect was not entitled to absolute immunity. "[The prosecutor] went beyond merely advising the police; she instructed them to arrest [the suspect], without soliciting any officer's opinion. Accordingly, the district court correctly determined that [the prosecutor] was acting in an administrative or investigative capacity and is, therefore, not entitled to absolute immunity." *Id*. at *5.

Shaw responds that: (1) he did not participate in the investigation or provide legal advice to Figurski; and (2) that he was following district court policy when performing his role as an advocate when approving and authorizing the submission of the search warrant.

a.      Legal Advice & Participation in the Investigation

Shaw argues that he neither participated in investigation nor provided any legal advice to Figurski. The record suggests otherwise.

Figurski testified that he had a number of conversations with Shaw during the investigation of "what to do and what not to do" in looking at Simons and Rivard: (1) "touching base" with Shaw concerning the search warrant for Simons' vehicle; (2) seeking and receiving Shaw's legal advice on whether Simons should be arrested before she died; (3) enlisting Shaw's assistance in writing the first search warrant for Simons' vehicle; and (4) viewing the patrol vehicle tape together.

Contrary to Shaw's assertions, Figurski's testimony indicates that Shaw's role in the investigation of the shooting went far beyond simply reading over the search warrant application and signing his name. The record indicates that Figurski often consulted Shaw during the investigation, before there was probable cause to have any individual arrested, and that Figurski relied upon Shaw's legal advice. When Figurski sought Shaw's legal opinion on whether the information in the search warrant affidavit was sufficient to establish probable cause, Shaw informed Figurski that his search warrant application lacked certain information, such as the need for recent diary entries and a confirmation of Simons' residence. Figurski also stated that the search warrant was written "together," with Shaw approving the affidavit as Figurski wrote.

It is clear that Shaw was not acting as an "advocate" in giving legal advice to Figurski on whether he had enough probable cause to obtain a search warrant for Plaintiffs' residence. *See Prince*, 198 F.3d at 615; *Manetta*, 141 F.3d at 274-75. In providing this legal guidance to Figurski, Shaw was not performing functions that were intimately associated with the judicial phase of a criminal proceeding, nor was he engaged in an effort to obtain or preserve evidence once probable cause existed to arrest a suspect. *See Lomaz v. Hennosy*, 151 F.3d 493, 499 (6th Cir. 1998) (holding that where probable cause existed to prosecute the suspect, and the purpose of the search warrant was to "obtain and preserve the evidence," the prosecutors were entitled to absolute immunity).

Therefore, the Court finds that Shaw is not entitled to absolute immunity for his role in the investigation and advising Shaw on the existence of probable cause for the search warrant.

b.      Review & Approval of Search Warrant

Shaw argues that his actions in reviewing and approving the search warrant, pursuant to local district court policy, was taken in his role as an advocate – thus shielded by absolute immunity.

Shaw insists that the district court's requirement that prosecutors review and approve a search warrant application creates a "judicially-delegated" duty whereby the approving prosecutor would be shielded by judicial or quasi-judicial immunity, relying upon *Sparks v. Character and Fitness Committee of Kentucky*, 859 F.2d 428 (6th Cir. 1988). In *Sparks*, the Sixth Circuit explained that individuals who perform duties on behalf of the judiciary enjoy similar immunity:

> The act of considering an application to the bar is a judicial act. And it is no less a
> judicial act simply because it is performed by nonjudicial officers in whom the
> responsibility for the performance of such duties is lawfully delegated by the

judiciary. Therefore, those who perform those duties on behalf of the judiciary are entitled to the same judicial immunity as would be enjoyed by judicial officers performing the same act.

*Id*. at 431. "[A]n official is entitled to absolute quasi-judicial immunity when that official acts pursuant to a valid court order because the act of enforcing or executing a court order is intrinsically associated with a judicial proceeding." *Cooper v. Parrish,* 203 F.3d 937, 948 (6th Cir. 2000) (internal quotations omitted). "[A]bsolute quasi-judicial immunity is unlike absolute judicial immunity in that it does not derive from the discretionary nature of an official's actions. Rather, it derives from the official's *lack* of discretion: Officials must not be called upon to answer for the legality of decisions which they are powerless to control. . . . Denying these officials absolute immunity for their acts would make them a light[ ]ning rod for harassing litigation aimed at judicial orders." *J.P. Silverton Indus. L.P. v. Sohm*, 243 Fed. Appx. 82, 89 (6th Cir. June 26, 2007) (unpublished) (internal citations and quotations omitted) (emphasis in original).

In the instant case, the district court policy of prosecutorial review of warrant applications effectively commandeers prosecutors to assist the district court judge to perform a judicial function – i.e. determining whether a warrant should issue. Prosecutors do not have discretion to refuse to follow the district court policy. Here, the record demonstrates that Shaw both "reviewed" and "approved" the warrant request for probable cause and determined that the warrant request was supported by probable cause, and would "do it again."[4] However, since the

---

[4]    The Court notes that this would be a different case if the district court did not require prosecutorial review of warrant applications.

The Supreme Court did not address in *Burns* the issue of whether a prosecutor's actions in reviewing an investigatory search warrant for sufficient probable cause, before probable cause to arrest existed, are entitled to absolute immunity. *See Burns*, 500 U.S. at 504-06 (Scalia, J.,

district court drafted Shaw to aid in its probable cause determination pursuant to a standing district court policy, he is shielded by quasi-judicial immunity for that act.

However, as explained above, Shaw would only enjoy qualified immunity for his participation in the investigation and his provision of legal advice on probable cause.

### 2. Qualified Immunity

The Court now considers whether Shaw is entitled to qualified immunity for his actions in connection with the search warrant.

Defendants' only argument as to qualified immunity is that "[t]here are no cases in the Sixth Circuit finding a constitutional violation for prosecutorial review of a search warrant under a judicially-delegated duty." (Def. Br. 10-11). As explained above, the facts of the case indicate that Shaw's involvement in the investigation went above and beyond simply signing his name on the search warrant application. Nevertheless, the Court must consider whether Shaw is entitled to qualified immunity for his alleged conduct.

---

concurring in part and dissenting in part) (stating that prosecutors have not historically enjoyed absolute immunity in procuring search warrants).

Indeed, the Ninth and Tenth Circuits have held that a prosecutor's role in reviewing investigative search warrants for probable cause, before the establishment of probable cause to arrest, is not entitled to absolute immunity. *See KRL v. Moore*, 384 F.3d 1105, 1114 (9th Cir. 2004) (holding that a prosecutor's review and approval of a search warrant, before probable cause exists to arrest any suspect, do not constitute "advocacy" under *Burns*); *Mink v. Suthers*, 482 F.3d 1244, 1262 (10th Cir. 2007) ("[T]he review of the affidavit cannot be said to be a uniquely prosecutorial role. While it is laudable that a legal review occur before the police proceed to a magistrate for a warrant, the Supreme Court made it clear in *Burns* that a legal review for a sufficiency of the evidence to support probable cause is not sufficient to confer absolute immunity").

In contrast with the instant case, there is no indication in *KRL* and *Mink* that the prosecutors were required by court policy to review and approve search warrants before submission to the magistrate or judge.

.

The Sixth Circuit has recently summarized the qualified immunity analysis as it applies

to § 1983 claims:

> To state a claim under 42 U.S.C. § 1983, a plaintiff must present facts sufficient
> to show that the defendants, acting under color of state law, deprived him of a
> specific right or interest secured by the Constitution or laws of the United States.
>
> . . . .
>
> Qualified immunity protects officials from liability when a reasonable official in
> the defendant's position would not have understood his or her actions to violate a
> person's constitutional rights. Under the doctrine of qualified immunity,
> "government officials performing discretionary functions, generally are shielded
> from liability for civil damages insofar as their conduct does not violate clearly
> established statutory or constitutional rights of which a reasonable person would
> have known."

*Meals v. City of Memphis*, 493 F.3d 727-29 (6th Cir. 2007) (internal citations omitted).

A court applies the following three-step analysis for evaluating a qualified immunity

defense:

> First, we determine whether, based upon the applicable law, the facts viewed in
> the light most favorable to the plaintiffs show that a constitutional violation has
> occurred. Second, we consider whether the violation involved a clearly
> established constitutional right of which a reasonable person would have known.
> Third, we determine whether the plaintiff has offered sufficient evidence "to
> indicate that what the official allegedly did was objectively unreasonable in light
> of the clearly established constitutional rights."

*Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003) (internal citations omitted). "If the plaintiff

fails to establish any one of these elements, qualified immunity must be granted." *Radvansky v.*

*City of Olmsted Falls,* 395 F.3d 291, 302 (6th Cir. 2005).

The Court must initially determine whether the facts, in the light most favorable to

Plaintiff, demonstrate a constitutional violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

> Although officers are entitled to rely on a judicially-secured warrant for immunity
> in a Section 1983 action claiming illegal search, if the warrant is so lacking in
> indicia of probable cause that official belief in the existence of probable cause is

unreasonable, qualified immunity is not appropriate. In *Malley,* the plaintiffs alleged that a police officer caused them to be arrested unconstitutionally by presenting to a judge a complaint and supporting affidavit that failed to establish probable cause. The Supreme Court rejected an argument that a police officer who had been sued for making an allegedly unconstitutional arrest should be conclusively deemed entitled to immunity as long as an independent magistrate had issued a warrant for the arrest. The Court subscribed to an "objective reasonableness" test: "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . . the shield of immunity [will] be lost."

Under an "objective reasonableness" test, the officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."

*Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004) (internal citations omitted).

The Sixth Circuit has further explained the "clearly-established" prong in relation to

illegal search claims:

In the context of an unconstitutional warrant, an official "will not be immune if . . . . it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." Put another way, if there can be reasonable disagreement, then the right cannot be considered "clearly established." Accordingly, to be entitled to qualified immunity, Defendants must "exercis[e] reasonable professional judgment" in applying for the warrant.

Probable cause to search requires "a 'substantial basis for . . . . [concluding]' that a search would uncover evidence of wrongdoing." The Supreme Court has never quantified the degree of certainty required for a determination of probable cause. It has stated that "probable cause means something 'less than evidence that would justify . . . . conviction,' but 'more than bare suspicion.'"

*Armstrong v. City of Melvindale*, 432 F.3d 695, 700-01 (6th Cir. 2006) (internal citations

omitted).

Viewing the evidence in the light most favorable to the non-moving party, the Court finds

that there is a genuine issue of material fact as to whether the search warrant was supported by

adequate probable cause. Figurski admitted that the target of the search warrant of Plaintiffs' residence were possible crimes committed by Simons, and not by Trooper Rivard. However, at the same time, Figurski recognized that Simons could not be prosecuted for any crimes, since she was dead. Per Figurski, the purpose of the search warrant was to discover the information relating to the "totality of the incident" to explain why Simons "started ramming patrol cars," and not any ongoing criminal activity. The search warrant application itself does not provide information indicating suspicion of any chargeable criminal activity on the part of Simons.

Shaw admitted that the purpose of the investigation was essentially to find out what happened, and not for the purpose of charging Simons posthumously with a crime. He also indicated that there was no probable cause to suspect that any other past or ongoing criminal activity was connected to Plaintiffs' residence.

The search warrant affidavit lacks any basis for concluding that a search would uncover evidence of any criminal activity occurring at Plaintiffs' residence. In fact, Figurski admitted that the true purpose of the search warrant was to attempt to explain why Simons attempted to evade the police officers. In other words, the search warrant lacks "substantial basis for . . . . [concluding] that a search would uncover evidence of wrongdoing." The circumstances of the search warrant request support Plaintiffs' theory that Defendants used the warrant to further a "fishing expedition" in order to discover information about Simons' mental state, and not to pursue any criminal investigation.

Therefore, the Court finds that Shaw is not entitled to qualified immunity on Plaintiff's illegal search claim.

### C. Civil Conspiracy under Section 1983

Plaintiffs allege that Shaw and the former Michigan State Police defendants "conspired together [and] reached a mutual understanding and acted to undertake a course of conduct that violated Plaintiffs' civil rights as stated in Count I." (Compl. ¶ 41).

The Sixth Circuit has explained the legal standards for a civil conspiracy claim under § 1983:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

> "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." Furthermore, this court has acknowledged that because "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . .circumstantial evidence may provide adequate proof of conspiracy."

*Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (internal citations omitted).

In this instance, the Court finds that Plaintiffs' allegations amount to no more than "vague and conclusory allegations unsupported by material facts." Plaintiff offers the following circumstances as "evidence" of a conspiracy: (1) anticipated civil litigation; (2) an incriminating police video of the shooting; and (3) the publicity generated by the event. These are plainly insufficient to demonstrate Plaintiffs' burden of showing "an unlawful agreement between two or more persons."

Since Plaintiffs have failed to meet their burden on summary judgment  to present "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986), the Court GRANTS summary judgment to Shaw on Plaintiff's civil conspiracy claim.

### D.    Defendant Lenawee County

Defendants contend that Plaintiffs have produced no evidence in support of their "failure to train" claim under § 1983. Plaintiff responds that Lenawee County's "unwritten policies and procedures" either: (1) do not condone authorizing improper search warrants; or (2) are flawed because they do not restrict the obtaining of search warrants for suspects who are deceased.

> A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury. One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision. To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.

*Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (internal citations omitted). "There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007). To prove that a municipality was "deliberately indifferent," a plaintiff must show that: (1) the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures; and (2) that the policies and practices directly caused the constitutional violation. *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005). "Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove municipal liability." *Id.* at 816.

From the evidence in the record, Plaintiffs have not demonstrated that Lenawee County was aware of prior unconstitutional actions by its employees and failed to take corrective measures or that the policy directly caused the constitutional violation.

Therefore, the Court GRANTS summary judgment to Lenawee County on Plaintiffs' § 1983 claim.

**III.    CONCLUSION**

For the foregoing reasons, the Court hereby:

(1)    **DENIES** summary judgment to Defendant Shaw on Plaintiff's § 1983 illegal search claim;

(2)    **GRANTS** summary judgment to Defendant Shaw of Plaintiff's § 1983 civil conspiracy claim; and

(3)    **GRANTS** summary judgment to Defendant Lenawee County.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE


Dated:  2/6/08

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 6, 2008


s/Denise Goodine
Case Manager